# Applicability of the Antideficiency Act to a Violation of a Condition or Internal Cap Within an Appropriation

Any expenditure of funds in violation of a condition or internal cap in an appropriations act would generally constitute a violation of the Antideficiency Act.

January 19, 2001

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
FOR ADMINISTRATION

The Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Antideficiency Act, codified at 31 U.S.C. §§ 1341-1342, 1349-1351, 1511-1519 (1994) ("ADA"), is one of several means by which Congress has sought to enforce this fundamental principle. *See* J. Gregory Sidak, *The President's Power of the Purse*, 1989 Duke L.J. 1162, 1234 ("The statutory mechanism by which Congress guards its appropriations power is the Anti-Deficiency Act."). The Act's central prohibition, set out at 31 U.S.C. § 1341(a)(1), provides in relevant part:

> An officer or employee of the United States Government or the District of Columbia government may not—(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; or (B) involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.

A violation of this section requires "appropriate administrative discipline," *id.* § 1349(a), including possible suspension without pay or removal from office, and, if the violation was knowing and willful, a fine of up to $5,000 and/or imprisonment of up to two years, *id.* § 1350. *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 430 (1990) (citing sections 1341 and 1350 for the proposition that "[i]t is a federal crime, punishable by fine and imprisonment, for any Government officer or employee to knowingly spend money in excess of that appropriated by Congress"); *see also Hercules, Inc. v. United States*, 516 U.S. 417, 427 (1996) ("The Anti-Deficiency Act bars a federal employee or agency from entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation."). In addition, violations must be reported by the head of the agency concerned to the President and Congress. 31 U.S.C. § 1351.

You have asked whether a violation of a "condition" or "internal cap" within an appropriations act would violate the Antideficiency Act. For purposes of this opinion, we assume that a "condition" on an appropriation would prohibit an agency from expending any of its funds for a particular purpose, and that an

"internal cap" would prohibit an agency from expending any of its funds in excess of a designated amount for a particular purpose. Your question arises in the specific context of the following provision of the Department of Justice Appropriation Act, 2000, Pub. L. No. 106-113, div. B, app. A, 113 Stat. 1501A-3, 1501A-11 (1999):

> For salaries and expenses for the Border Patrol program, the detention and deportation program, the intelligence program, the investigations program, and the inspections program . . . $1,107,429,000 . . . . *Provided further*, That none of the funds available to the Immigration and Naturalization Service ["INS"] shall be available to pay any employee overtime pay in an amount in excess of $30,000 during the calendar year beginning January 1, 2000.

We understand this provision to be an internal cap, and thus to have prohibited the Department of Justice from using any funds available to the INS under any appropriation to pay any individual employee more than $30,000 in overtime during calendar year 2000. There are, of course, a variety of other ways in which Congress sets limits in appropriations. For example, Congress often earmarks funds for specific purposes. *See, e.g.*, Department of Transportation and Related Agencies Appropriations Act, 1997, Pub. L. No. 104-205, 110 Stat. 2951, 2951-52 (1996) (appropriating "for necessary expenses for conducting transportation planning, research, systems development, and development activities . . . $3,000,000"). Congress also imposes ceilings within particular appropriations acts. *See id.*, 110 Stat. at 2952 (providing that "none of the funds in *this* Act shall be available for the implementation or execution of programs in excess of $25,900,000 for the Payments to Air Carriers program in fiscal year 1997") (emphasis added). For purposes of this opinion, we employ a narrow definition of "conditions" and "internal caps," which does not include these other types of limits, and do not address the applicability of the Antideficiency Act to these other types of limitations.[1]

---

[1] Our opinion, therefore, does not address situations where purpose restrictions apply to some—but not all—funds available to an agency, or where those restrictions are not found in appropriations acts. Nor does our opinion address whether the Department may use statutory "reprogramming" or transfer authority, *see, e.g.*, Department of Justice Appropriation Act, 2000, §§ 605, 107, 113 Stat. at 1501A-52 to 1501A-53, 1501A-19, to avoid the limitations of a condition or internal cap, or to cure retroactively expenditures that would, in the absence of a reprogramming of funds, violate the Antideficiency Act. We also do not consider what the legal effect might be of after-the-fact delegations or ratifications (by authorized officials) to cure obligations or expenditures made by persons acting without requisite legal authority. Finally, this memorandum does not address the situation in which a condition or internal cap within an appropriations act implicates another branch's discharge of its constitutionally assigned functions. *Cf.* Memorandum for the Attorney General from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Application of the Independent Counsel Provisions of the Ethics in Government Act to Alleged Violations of the Boland Amendment and the Antideficiency Act* (Apr. 27,

By its terms, the Antideficiency Act prohibits any expenditure or obligation exceeding an amount "*available* in an appropriation or fund *for the expenditure or obligation*." 31 U.S.C. § 1341(a)(1)(A) (emphases added). The question before us, therefore, is whether, when Congress has expressly prohibited the expenditure of any funds for a particular purpose, or of any funds in excess of a specific amount appropriated for that purpose, an agency's expenditure of funds in violation of such a limit necessarily also "exceed[s] an amount available . . . for the expenditure," even when there are sufficient unobligated funds otherwise available in an appropriation to cover the expenditure. The question whether violation of a "condition" or "internal cap" also violates the Antideficiency Act is a difficult issue of first impression for this Office.[2] Its importance is underscored by the availability of criminal felony sanctions against government officers and employees who knowingly and willfully authorize or make such expenditures. For the reasons set forth below, we conclude that a violation of a condition or internal cap within an appropriation would generally constitute a violation of the Antideficiency Act.[3]

---

1984) ("Olson Memorandum") (alleged violation of Boland Amendment, which implicated President's foreign affairs powers, could not reasonably be construed as a federal crime under Antideficiency Act due to justiciability concerns based on political question doctrine, lack of specific manageable standards, and vagueness of the Amendment); *Authority for the Continuance of Government Functions During a Temporary Lapse in Appropriations*, 5 Op. O.L.C. 1, 5-7 (1981) (President's obligational authority may be strengthened in connection with initiatives grounded in peculiar institutional powers and competency of the President; Antideficiency Act not necessarily dispositive in such circumstances); *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 435 (1990) (White, J., concurring) (noting that Congress may not "impair the President's pardon power by denying him appropriations for pen and paper"); *see also* J. Gregory Sidak, *The Recommendation Clause*, 77 Geo. L.J. 2079 (1989) (arguing that certain appropriations riders raise separation of powers concerns and conflict with the President's constitutional duty to make recommendations to Congress); Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1352 (1988) (noting that "Congress may not completely frustrate the exercise of the President's constitutional duties").

[2] *Cf.* Olson Memorandum (assuming without discussion that alleged violation of Boland Amendment, which imposed a condition within an appropriation, would violate Antideficiency Act absent separation of powers concerns).

[3] There may be circumstances in which determining the precise scope of a condition or internal cap raises difficult issues. Congress may, for example, enact a law in the middle of a fiscal year stating that previously available funds may no longer be used for a particular, previously authorized, purpose. After the effective date of such a law, previously available and unobligated funds could no longer be *obligated* for the proscribed purpose. However, a construction of such a law that would preclude, after the effective date, *expenditure* of funds that had been obligated prior to the effective date for services rendered prior to the effective date could cause the government to breach certain contracts or to violate federal personnel laws. These considerations, along with the general presumption that statutes should not be given retroactive effect, *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994), might reasonably justify the conclusion that such a law should be construed, if possible, not to prohibit the payment of such obligations. There may be other circumstances where determining the legal availability of funds under a condition or internal cap poses similarly difficult interpretive questions that we cannot, and therefore do not, address.

## I. Language and Structure of the Act

As in all cases of statutory interpretation, we begin with the language of the Act itself. *See United States v. Ron Pair Enterprises*, 489 U.S. 235, 241 (1989); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Section 1341(a)(1) prohibits any "expenditure or obligation exceeding an amount *available* in an appropriation or fund *for the expenditure or obligation*." 31 U.S.C. § 1341(a)(1)(A) (emphasis added). The scope of the Act's coverage thus turns, to a significant degree, on the meaning of the term "available" in this context. Webster's Third New International Dictionary defines "available" to mean "valid"; "such as may be availed of: capable of use for the accomplishment of a purpose: immediately utilizable"; or "that is accessible or may be obtained." *Webster's Third New International Dictionary* 150 (1993). Similarly, Black's Law Dictionary defines the term "available" to mean either "[s]uitable; useable; accessible; obtainable; present or ready for immediate use," or "[h]aving sufficient force or efficacy; effectual; valid." *Black's Law Dictionary* 135 (6th ed. 1990). These definitions reflect two distinct concepts. To the extent the word "available" means "present or ready for immediate use," it appears to require only that funds be accessible or obtainable in a practical sense—i.e., unobligated. So understood, the Act would generally prohibit only those expenditures that exceed the total amount of funds Congress has provided within a particular account—i.e., those expenditures that result in so-called "coercive deficiencies" because they effectively obligate Congress to appropriate additional funds. On the other hand, to the extent that "available" also incorporates the concept of "validity," it suggests an additional requirement of legal permissibility. On this reading, if Congress provides that "no funds made available under this or any other appropriation shall be available to pay in excess of $30,000 for overtime," only $30,000 is "available," within the meaning of the Antideficiency Act, for that purpose. Any expenditure in excess of that sum on overtime, accordingly, is an "expenditure or obligation exceeding an amount available in an appropriation," regardless of whether such an expenditure would cause an agency or office to exceed its overall appropriation. Although the statute is not entirely free from ambiguity on this point, we conclude that the second reading better comports with the Act's language and structure.

Various arguments may be mustered from the text and structure of the statute and related provisions to support the view that "available" in the context of section 1341(a)(1) simply means "unobligated." For example, because subsection (a)(1)(B) sets forth a clearly temporal limitation on contracting or otherwise obligating federal funds—i.e., no spending "before an appropriation is made"—it might be argued that the parallel proscription of subsection (a)(1)(A) should likewise be understood as a temporal limitation—i.e., no spending "after funds are exhausted." In other words, the Act reflects Congress's concern with preventing spending that creates deficiencies, rather than with enforcing restrictions on

spending for particular purposes. This interpretation draws support from other provisions of the Act (codified at 31 U.S.C. §§ 1511-1519) that require federal agencies to apportion their funds throughout the fiscal year. Section 1512(a) provides generally that, except as otherwise provided, "an appropriation available for a definite period shall be apportioned to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period."[4] The responsible agency official may make such apportionments by "(A) months, calendar quarters, operating seasons, or other time periods; (B) activities, functions, projects, or objects; or (C) a combination of the ways referred to in clauses (A) and (B)," as the official considers appropriate. 31 U.S.C. § 1512(b)(1). Section 1517(a) makes it unlawful for an officer or employee of a federal agency or the District of Columbia government to "make or authorize an expenditure or obligation exceeding . . . an apportionment." The penalties for violating this prohibition are essentially identical to those mandated for violations of section 1341(a): reporting of violations to the President and Congress, *see* 31 U.S.C. § 1517(b), "appropriate administrative discipline, including, when circumstances warrant, suspension from duty without pay or removal from office," 31 U.S.C. § 1518, and, in the case of "knowing[] and willful[]" violations, criminal sanctions that may include a fine of up to $5000, imprisonment for up to two years, or both, 31 U.S.C. § 1519. *Cf.* 31 U.S.C. §§ 1349(a), 1350, 1351. These provisions highlight the degree to which Congress sought in the Antideficiency Act to prevent government agencies from exceeding their appropriated funds in a given fiscal year.[5]

Congress's obvious concern with overall deficiencies caused by expenditures in excess of appropriated funds does not, however, exclude the possibility that it also intended through the Antideficiency Act to enforce its appropriations power by exercising control over the *purposes* for which agencies may use their appropriated funds. Indeed, there is considerable textual evidence to support a reading of the term "available" that incorporates a "legal permissibility" component as well as the basic requirement that sufficient funds be unexpended or "unobligated." In section 1341(a)(1)(A) itself, the word "available" is modified by the phrase "for

---

[4] Certain exceptions to this requirement are set out in 31 U.S.C. § 1515.

[5] This reading is also arguably supported by another provision in chapter 13 of title 31 (the chapter entitled "Appropriations," which also includes section 1341(a)), in which Congress appears to have used the term "available" to mean simply unobligated. In section 1344(a)(1), Congress referred to "available" funds, then separately specified a limitation on the permissible use of such funds. *See* 31 U.S.C. § 1344(a)(1) ("Funds available to a Federal agency, by appropriation or otherwise, may be expended . . . for the maintenance, operation, or repair of any passenger carrier only to the extent that such carrier is used to provide transportation for official purposes."). *Cf. Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (relying on slight differences in language in "nearby sections of Title 28" to construe the term "jurisdiction"). *But see infra* pp. 38-39 (discussing other uses of term "available" in title 31).

the expenditure or obligation," which suggests a more restrictive intent.[6] If Congress had intended to address solely the problem of overall deficiency spending, this phrase would appear somewhat superfluous. Congress could have simply prohibited any expenditure or obligation "exceeding an amount available in an appropriation." The fact that Congress did not simply prohibit expenditures in excess of total appropriations suggests that the term "available" should be construed more broadly to encompass the concept of legal permissibility. Nor does the temporal focus of subsection (a)(1)(B) compel the conclusion that subsection (a)(1)(A) has a similarly limited focus. It is just as logical to conclude that these separate prohibitions were aimed at separate problems, only one of which had a purely temporal dimension.

As noted above, Congress often uses the term "available" in its appropriations acts in a manner that clearly connotes legal permissibility. *See, e.g.*, Pub. L. No. 101-516, 104 Stat. 2155, 2157 (1990) ("none of the funds in this or any other Act shall be *available* for the implementation or execution of programs in excess of $26,600 for the Payments to Air Carriers program") (emphasis added). Similarly, Congress has used "available" in this sense in numerous other provisions of chapters 13 and 15 of title 31. Section 1343(d), for example, provides that an appropriation "is available to buy, maintain, or operate an aircraft only if the appropriation specifically authorizes the purchase, maintenance, or operation." 31 U.S.C. § 1343(d). Section 1346 provides that "public money and appropriations are not available to pay" certain expenses related to commissions, councils, boards, and similar groups, but that the "[a]ppropriations of an executive agency are available for the expenses of an interagency group conducting activities of interest common to executive agencies when the group includes a representative of the agency." *Id*. § 1346(a), (b). Section 1348 provides that "[e]xcept as provided in this section, appropriations are not available to install telephones in private residences or for tolls or other charges for telephone service from private residences," but that the "[a]ppropriations of an agency are available to pay charges for a long-distance call if required for official business," provided "the head of the agency . . . certifies that the call is necessary in the interest of the Government." *Id*. § 1348(a)(1), (b). In each of these statutes, Congress used the term "available" in a manner that is not dependent on whether funds are actually "unobligated," and that instead limits the permissible purposes for which funds may be spent. *See also* 31 U.S.C. § 1502(a) ("The balance of an appropriation or fund limited for obligation to a definite period is available only for payment of expenses properly incurred during the period of availability or to complete contracts properly made within that period of availability and obligated consistent with section 1501 of this title.")

---

[6] *See infra* pp. 39-40 (discussing changes in text made by 1982 recodification of title 31, which Congress did not intend to have substantive effect).

An argument can be made, however, that the current language of section 1341(a)(1) should be read more narrowly in view of the fact that it was enacted as part of the 1982 general recodification of title 31, which was not intended to make any substantive change in the law. *See* H.R. Rep. No. 97-651, at 1-3 (1982), *reprinted in* 1982 U.S.C.C.A.N. 1895, 1896 (describing purpose of bill "to revise, codify, and enact without substantive change certain general and permanent laws related to money and finance as title 31, United States Code, 'Money and Finance,'" and to simplify language); *see also Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 318 (1985) (when enacted without substantive comment, change during codification of legislation is generally held not to have been intended to alter statute's scope); *cf. Interpretation of the Grandfather Clause in 18 U.S.C. § 709—Use of Word "Federal" in Name of Insurance Company*, 1 Op. O.L.C. 60, 61 (1977) ("the relevant law is not strictly" criminal statute as revised in 1948, but rather its predecessor). The previous version of the Antideficiency Act, as enacted in 1950 (the last occasion on which Congress made substantive changes to this section), provided:

> No officer or employee of the United States shall make or authorize an expenditure from or create or authorize an obligation under any appropriation or fund in excess of the amount available therein; nor shall any such officer or employee involve the Government in any contract or other obligation, for the payment of money for any pur-pose, in advance of appropriations made for such purpose, unless such contract or obligation is authorized by law.

31 U.S.C. § 655(a) (1976). Notably, in the first clause of the pre-1982 statute, the word "available" is not modified by the phrase "for the expenditure or obligation," but rather by the term "therein." Indeed, only the second clause, which concerns obligations in advance of appropriations, contains express purpose-restrictive language. Arguably, therefore, the 1950 statute did not use the term "available" to capture the concept of "legal permissibility," and the language added by the 1982 recodification should not be read to incorporate that concept either, because the legislative history of the recodification indicates only an intent to standardize and simplify statutory language within the title.

Ultimately, however, we do not find this argument persuasive. Congress's statement that the recodification worked no substantive change in the law is perfectly consistent with the conclusion that the language added in 1982 did nothing more than confirm that the word "available" in the Act had always incorporated the concept of legal permissibility. The express prohibition in the 1950 law on obligations incurred in advance of appropriations "made for such purpose" supports this view. It seems highly unlikely that Congress would have intended to adopt a legal-availability approach to the second clause of the 1950

law, but not to the first clause. Indeed, as we explain below, this understanding of the 1950 version is consistent with the fact that, when Congress amended the law that year, it deleted the phrases "in any one fiscal year" and "for that fiscal year" from the statute, thereby broadening the statutory focus beyond an apparent concern with overall deficiencies.[7]

We have also considered whether the "Purpose Statute," 31 U.S.C. § 1301(a), provides any basis for a narrowing construction of the Antideficiency Act. The Purpose Statute, which predates the Antideficiency Act and carries no criminal penalties, provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." *Id*. Although, as the Supreme Court has observed, "it is hardly a novel proposition that [two statutes] 'prohibit some of the same conduct,'" *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983) (quoting *United States v. Naftalin*, 441 U.S. 768, 778 (1979), and referring to overlap of 1933 and 1934 securities laws), a construction of one statute that renders another wholly superfluous should generally be avoided. *See Jarecki v. G.D. Searle & Co*., 367 U.S. 303, 307 (1961) ("If there is a big hole in the fence for the big cat, need there be a small hole for the small one?"). If the Purpose Statute prohibits nothing more than expenditures and obligations that are illegal under the Antideficiency Act, then the civil prohibition of the Purpose Statute would have no independent function. This is not the case, however, because the Purpose Statute may be violated in circumstances where no violation of the Antideficiency Act occurs. For example, the Comptroller General has consistently found that "deliberately charging the wrong appropriation for purposes of expediency or administrative convenience, with the expectation of rectifying the situation by a subsequent transfer from the right appropriation, violates [the Purpose Statute]." 1 General Accounting Office, *Principles of Federal Appropriations Law* 4-4 (2d ed. 1991) ("*Federal Appropriations Law*") (citing 36 Comp. Gen. 386 (1956); 26 Comp. Gen. 902, 906 (1947); 19 Comp. Gen. 395 (1939); 14 Comp. Gen. 103 (1934)). In such circumstances, funds are "available" under the broader construction of that term in the Antideficiency Act, because funds are both "on deposit" and may legally be obligated or expended for the purpose in question; thus, although the expenditure would not run afoul of the broader reading of the Antideficiency Act, it violates the Purpose Statute's requirement that funds be "applied only to the objects for which the [charged] appropriation[] [was] made." *See* 63 Comp. Gen. 422, 424 (1984) ("Even though an expenditure may have been charged to an improper source, the Antideficiency Act's prohibition against incurring obligations in excess or in advance of available appropriations is not also violated unless no other funds were available for that expenditure."). Although the legal interpretations of the Comptroller General are

---

[7] As discussed below, this reading of the text is consistent with interpretations of the pre-1982 versions of the Act by the Supreme Court, the Comptroller General, and members of Congress.

not binding on the Executive Branch, *see Bowsher v. Synar*, 478 U.S. 714, 727-32 (1986), we find this interpretation of the Purpose Statute persuasive.[8] Accordingly, because we find that the Purpose Statute may apply in circumstances where, even under a broad reading, the Antideficiency Act would not, the existence of the Purpose Statute provides no basis for narrowly construing the language of the Antideficiency Act.

Similarly, we do not believe that the "rule of lenity" justifies a construction of the Act that equates the terms "available" and "unobligated." To be sure, the Supreme Court has "instructed that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity,' . . . and that 'when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.'" *Jones v. United States*, 529 U.S. 848, 858 (2000) (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971), and *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952), respectively). The degree of ambiguity in the Antideficiency Act, however, is insufficient to warrant invocation of this rule. As the Court has explained, "[l]enity applies only when the equipoise of competing reasons cannot otherwise be resolved." *Johnson v. United States*, 120 S. Ct. 1795, 1807 n.13 (2000). Thus, the rule of lenity applies "'only if, after seizing everything from which aid can be derived, . . . we can make no more than a guess as to what Congress intended,'" *Holloway v. United States*, 526 U.S. 1, 12 n.14 (1999) (quoting *Muscarello v. United States*, 524 U.S. 125, 138 (1999)) (additional quotations and citations omitted), or where "there is a ""grievous ambiguity or uncertainty'" in the statute,'" *Muscarello*, 524 U.S. at 139 (quoting *Staples v. United States*, 511 U.S. 600, 619 n.17 (1994) (quoting *Chapman v. United States*, 500 U.S. 453, 463 (1991))). *See also* 3 Norman J. Singer, *Sutherland on Statutes and Statutory Construction* § 59.03 (5th ed. 1992) ("In fact, it has been said that the rule of lenity is a tie breaker when there is an otherwise unresolved ambiguity."). Although the language of the Antideficiency Act admits of some ambiguity, there is by no means a "grievous ambiguity or uncertainty in the statute," nor complete equipoise between the competing interpretations we have identified. Rather, as we have explained, we believe that the text of section 1341(a)(1) is best read to apply to violations of conditions and internal caps within appropriations acts. Moreover, "everything from which aid can be derived," *Holloway v. United States*, 526 U.S. at 12 n.14, serves to clarify and confirm this reading, rather than requiring us to "make no more than a guess as to what Congress intended." *Id*. Thus, as we

---

[8] For purposes of resolving the question before us, we need not consider any other interpretations of the Purpose Statute that the Comptroller General has rendered, and should not be understood generally to embrace the substantial body of opinions the Comptroller General has issued with respect to this statute. *See generally* 1 *Federal Appropriations Law* ch. 4.

explain below, the Act's legislative history, relevant court decisions, decisions of the Comptroller General, and scholarly commentary all support our conclusion that the Act applies to expenditures that violate conditions and internal caps within appropriations acts.

## II. History and Evolution of the Act

Our examination of the historical record confirms our view that, except in those circumstances in which an internal cap or condition would prevent another branch from discharging its constitutionally assigned functions, *see supra* note 1, the text of the Antideficiency Act is best read to prohibit an expenditure in excess of such a condition or internal cap. *See Crandon v. United States*, 494 U.S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.").

What is now known as the Antideficiency Act arose during the nineteenth century from Congress's increasing frustration with the failure of Executive Branch agencies to stay within the budgets Congress allocated to them. At least as early as 1809, members of Congress complained of budgetary abuses and misapplication of funds by the War and Navy departments, and in that year Congress passed legislation requiring that "the sums appropriated by law for each branch of expenditure in the several departments shall be solely applied to the objects for which they are respectively appropriated, and to no other." Act of Mar. 3, 1809, ch. 28, § 1, 2 Stat. 535, 535; *see also* 19 Annals of Cong. 1551-55, 1560-61, 1575 (1809).[9] In 1820, Congress enacted additional legislation providing that, with certain exceptions for obtaining subsistence and clothing, "no contract shall hereafter be made by the Secretary of State, or of the Treasury, or of the Department of War, or of the Navy, except under a law authorizing the same, or under an appropriation adequate to its fulfilment." Act of May 1, 1820, ch. 52, § 6, 3 Stat.

---

[9] This precursor of the present-day "Purpose Statute" (31 U.S.C. § 1301(a) (1994)) permitted the President to authorize a transfer of funds from one "branch of expenditure" within a particular department to another "branch of expenditure" within the same department. *See* 2 Stat. at 235. Congress repealed that authority in 1868, amending the 1809 Act to provide that "all acts or parts of acts authorizing such transfers of appropriations be and the same are hereby repealed, and no money appropriated for one purpose shall hereafter be used for any other purpose than that for which it is appropriated." Act of Feb. 12, 1868, ch. 8, § 2, 15 Stat. 35, 36. The Act was subsequently codified as section 3678 of the Revised Statutes, which provided: "All sums appropriated for the various branches of expenditure in the public service shall be applied solely to the objects for which they are respectively made, and for no others." Rev. Stat. § 3678 (2d ed. 1878), 18 Stat. pt. 1, at 723 (repl. vol.). The current version of the Purpose Statute (as recodified in 1982) provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a).

567, 568.[10] In 1868, Congress passed a statute providing that "no contract shall be entered into for the erection, repair, or furnishing of any public building, or for any public improvement . . . which shall bind the government to pay a larger sum of money than the amount in the treasury *appropriated for the specific purpose*." Act of July 25, 1868, ch. 233, § 3, 15 Stat. 171, 177 (codified at Rev. Stat. § 3733 (2d ed. 1878), 18 Stat. pt. 1, at 736-37) (repl. vol.)) (emphasis added). The 1868 Act established criminal penalties of up to two years imprisonment and a $2000 fine for "knowing" violations. *Id.* (codified at Rev. Stat. § 5503 (2d ed. 1878), 18 Stat. pt 1, at 1066 (repl. vol.)).[11]

In 1870, Congress again expressed its frustration with Executive Branch over-spending by enacting general legislation making it unlawful "for any department of the government to expend in any one fiscal year any sum in excess of appropriations made by Congress for that fiscal year, or to involve the government in any contract for the future payment of money in excess of such appropriations." Act of July 12, 1870, ch. 251, § 7, 16 Stat. 230, 251 (codified at Rev. Stat. § 3679 (2d ed. 1878), 18 Stat. pt. 1, at 723 (repl. vol.)). This was the original version of the Antideficiency Act, which has since been amended on numerous occasions.[12] When asked why such legislation was needed, given that its prohibition was already "the law of the land," the amendment's sponsor replied: "Well they do not adhere to it. I want to put it in here, so that it shall have force and effect on every appropriation." Cong. Globe, 41st Cong., 2d Sess. 1553 (1870) (Remarks of Rep. Randall).

Despite these legislative efforts to enforce its fiscal prerogatives, Congress continued to find itself faced with situations in which federal agencies exceeded their budgets and then presented Congress with deficiencies, which Congress felt obliged to pay. In 1905, Congress attempted to address this problem by amending

---

[10] This provision was subsequently codified as section 3732 of the Revised Statutes (2d ed. 1878), 18 Stat. pt. 1, at 736 (repl. vol.), and exists in a somewhat different form today as 41 U.S.C. § 11 (1994).

[11] This criminal offense is currently codified at 18 U.S.C. § 435 (1994) ("Whoever, being an officer or employee of the United States, knowingly contracts for the erection, repair, or furnishing of any public building, or for any public improvement, to pay a larger amount than *the specific sum appropriated for such purpose*, shall be fined under this title or imprisoned not more than one year, or both.") (emphasis added); *see also* 41 U.S.C. § 12 (1994). The 1948 Reviser's Note, 18 U.S.C. § 435, states that the applicable punishment was reduced because "[t]he offense described in this section involves no moral turpitude" and should not carry "the stigma of a felony." We have been unable to find any discussion of the relationship between this statute and the Antideficiency Act, or any explanation of the discrepancy in their criminal sanctions.

[12] Act of Mar. 3, 1905, ch. 1484, § 4, 33 Stat. 1257; Act of Feb. 27, 1906, ch. 510, § 3, 34 Stat. 27, 48; Act of Aug. 23, 1912, ch. 350, § 6, 37 Stat. 360, 414; Act of Sept. 6, 1950, ch. 896, § 1211, 64 Stat. 595, 765; Act of Aug. 1, 1956, ch. 814, § 3, 70 Stat. 782, 783; Pub. L. No. 85-170, § 1401, 71 Stat. 426, 440 (1957); Pub. L. No. 93-344, § 1002, 88 Stat. 297, 332 (1974); Pub. L. No. 93-618, § 175(a), 88 Stat. 1978, 2011 (1975); Pub. L. No. 101-508, § 13213(a), 104 Stat. 1388, 1388-621 (1990).

Rev. Stat. § 3679 in several significant ways. *See* Act of Mar. 3, 1905, ch. 1484, § 4, 33 Stat. 1257. The amended Antideficiency Act provided:

> No Department of the Government shall expend, in any one fiscal year, any sum in excess of appropriations made by Congress for that fiscal year, or involve the Government in any contract or obligation for the future payment of money in excess of such appropriations unless such contract or obligation is authorized by law. . . . Any person violating any provision of this section shall be summarily removed from office and may also be punished by a fine of not less than one hundred dollars or by imprisonment for not less than one month.

33 Stat. at 1257-58 (1905). The 1905 amendment also added restrictions on the acceptance of voluntary services and required that certain types of funds be apportioned over the course of the fiscal year, although it permitted heads of departments to waive or modify an apportionment in particular cases. *Id*. The purpose of the new apportionment requirement was "to prevent undue expenditures in one portion of the year that may require deficiency or additional appropriations to complete the service of the fiscal year." *Id*. at 1258. In introducing the proposed amendment, Representative Hemenway (Chairman of the Appropriations Committee, which reported the bill) explained:

> I call attention to this particular limitation because we seek by it to prevent deficiencies in the future. . . . We give to Departments what we think is ample, but they come back with a deficiency. Under the law they can make these deficiencies, and Congress can refuse to allow them; but after they are made it is very hard to refuse to allow them. So we seek by this amendment to in some respect, at least, cure that abuse.

39 Cong. Rec. 3687 (1905); *see also id*. at 3689-92, 3780-82 (statements of other members of Appropriations Committee expressing frustration with deficiencies incurred by Executive Branch and then presented to Congress).

Although much of the legislative debate focused on the problem of overall deficiencies, several Committee members and other representatives emphasized the need to prevent Executive Branch departments from taking funds authorized for one purpose and using them for another, noting that such abuses were a significant cause of deficiencies. *See, e.g*., 39 Cong. Rec. 3692 (statement of Rep. Livingston) ("some of the Departments of this Government have been absolutely taking lump sums appropriated for a particular purpose and promoting clerks and officers out of it"); *id*. at 3780 (statement of Rep. Underwood) (criticizing deficiencies "made by Department officers, who exceeded the law and used moneys appropriated for one purpose for a different purpose than Congress

intended"); *id*. at 3783 (statement of Rep. Underwood) ("if the officers of the Government had stayed within the law and only used their funds for the purpose they should have been used for the deficiency would not have occurred"). There was extensive discussion in the House of an incident in which a Navy official used funds appropriated for the maintenance of battleships in order to install two sights on guns for which only one sight had been authorized by Congress. *See id*. at 3781 (statement of Rep. Underwood) ("the money appropriated for the ordinary maintenance and care of the battle ships of the country has been used for other purposes; I will not say illegitimate purposes, but for purposes that the Navy Department should have come to Congress and asked the authority of the Naval Committee to do"). Another example concerned a State Department official's "misapplication of the fund" appropriated for ordinary printing in order to print a book that Congress had not authorized. *Id*. at 3781 ("Mr. Littlefield. Will the amendment which the committee have proposed . . . reach a case like this? Mr. Underwood. It will."). Representative Underwood, who was also a member of the committee that reported the bill, repeatedly asserted, without contradiction, that the proposed bill would "stop" such abuses and "prevent this thing being done in the future." *Id*. at 3780, 3781; *see also id*. at 3691 (statement of Rep. Livingston) ("if you permit this clause to remain in this bill there will be no more expenditure of money without authority").[13] Indeed, Representative Underwood stated the goal of the antideficiency provision in broad constitutional terms:

> This is only one illustration. It shows how the money that we appropriate . . . is misapplied, and it demonstrates conclusively how necessary it is for Congress to pass some legislation such as we propose in this bill to check that evil and retain the power of appropriation in the hands of Congress. We are getting farther and farther away from it every day. The great power that was intended to be exercised by the legislative branch of the Government is being taken away from it by departmental officers creating deficiencies for purposes that are not authorized   under the law.

*Id*. at 3782.

Within a year, Congress again sought to strengthen its control over appropriations by amending the Act to prohibit department heads from modifying apportionments except in "extraordinary emergenc[ies] or unusual circumstance[s]" that could not have been anticipated when the appropriated funds were apportioned. *See* 34 Stat. 27, 48-49 (1906). Representative Littauer, the sponsor of the amendment, reiterated the need for the House to "regain its control over appropria-

---

[13] The primary reason identified for lack of compliance with existing law was the lack of any penalty for violation of the statute. *See* 39 Cong. Rec. at 3690, 3780, 3781.

tions . . . in order that the Departments may understand that such moneys, and such moneys alone as we appropriate, will be at their service to carry on the work of the Government." 40 Cong. Rec. 1275 (1906). Again, various members of the House indicated their understanding that the Act applied not just to expenditures in excess of total appropriations, but rather also to expenditures inconsistent with the express terms of the appropriations. Thus, Representative Fitzgerald identified one cause of deficiencies as "officials spending money in defiance of the action of Congress in refusing to appropriate money for the purpose for which they estimated," and stated that "[i]t is necessary for Congress to impress upon the men in the administrative offices of the Government that Congress means just what it says in the law, and that if these men do not comply with it they will not only be dismissed from the public service, but they shall be punished as this law provides." *Id*. at 1289-90. Similarly, Representative Burton emphasized the duty of the people's representatives "to determine *for what objects* expenditures shall be made and *how much* shall be expended," and asserted that members of Congress must "scrutinize the public expenditures and make sure that they are applied to purposes which approve themselves to our judgment and to the judgment of the people." *Id*. at 1298 (emphasis added).[14] A particular example of conduct the 1906 amendment sought to prevent was the Attorney General's use of the Justice Department's miscellaneous expenditures account to commission a portrait. *See id*. at 1274-75; *see also id*. at 1275 (Rep. Gaines) ("[T]he law should not have been evaded . . . by taking public funds that were not appropriated to do this particular thing."). In response to a question as to whether "Congress should deprive the heads of these Departments of all discretion . . . and allow them to expend no money for any purpose except that specifically appropriated for that particular purpose," Representative Brundidge responded: "that is practically the law now." *Id*. at 1276 (noting the exception for emergencies).

As the foregoing history reveals, although the language of the statute at that time—which merely prohibited expenditures "in any one fiscal year" in an amount "in excess of appropriations made by Congress for that fiscal year"—appeared designed primarily to prevent overall deficiencies, a number of members of Congress asserted (without opposition) that the 1905 and 1906 amendments would also enforce Congress's constitutional authority to control the objects on which funds were to be spent. Indeed, the remarks cited above indicate that proponents of the legislation believed that unauthorized spending—that is, spending on projects that Congress had failed to authorize, or spending more money on projects than Congress had authorized—was a primary *cause* of overall deficiencies. These

---

[14] Representative Burton also stated with respect to the Act's penalty provisions that, "unless the law is very severe," executive officers would spend funds on particular items they had recommended that were rejected by Congress. "It is fit and proper that by the severest penalties we should provide against that possibility." *Id*. at 1298.

proponents, therefore, presumably would not have perceived any inherent tension between the goal of barring coercive deficiencies and the goal of barring spending in excess of conditions or internal caps; any statutory focus on the former goal, therefore, does not necessarily demonstrate that Congress did not intend to achieve the latter as well.

In subsequent years, Congress continued to modify the Act in an attempt to rein in overspending by the Executive Branch and retain control of the federal fisc in the hands of Congress. In 1950, Congress amended the first portion of the statute to read:

> Sec. 3679. (a) No officer or employee of the United States shall make or authorize an expenditure from or create or authorize an obligation under any appropriation or fund in excess of the amount available therein; nor shall any such officer or employee involve the Government in any contract or other obligation, for the payment of money for any purpose, in advance of appropriations made for such purpose, unless such contract or obligation is authorized by law.

Pub. L. No. 81-759, 64 Stat. 595, 765.[15] Notably, the 1950 amendment eliminated the phrases "in any one fiscal year" and "for that fiscal year," thereby changing the focus of the Act's language from overall spending to spending out of particular appropriations, and also introduced the term "available" for the first time in the Act's history. *See* 96 Cong. Rec. at 6835 ("subsection (a) would prohibit the making or authorizing of expenditures in excess of *the amount available in any appropriation or fund*") (emphasis added). The legislative history provides little explanation for these changes. The House Report merely noted that the existing statute was "antiquated" and needed redrafting in light of the increasing complexity of the government, *see* H.R. Rep. No. 81-1797, at 9 (1950), while the legislative debates once again focused on the problem of deficiencies. Representative Norrell, a committee member and sponsor of the amendment, stated: "The entire effort is to try to discourage, if not entirely eliminate, supplementals and deficiencies." 96 Cong. Rec. at 6726; *see also id*. at 6729 (purpose of amendment is to restore "proper control over appropriations" to Congress) (remarks of Rep. Taber and Rep. Wigglesworth). Yet Congress also seems to have been concerned with fiscal

---

[15] Congress also increased the maximum penalty for "knowing[] and willful[]" violations of this provision of the Act to a $5000 fine and two years imprisonment, and for all other violations required "appropriate administrative discipline, including, when circumstances warrant, suspension from duty without pay or removal from office." § 3679(i), 64 Stat. at 768; *see also* 96 Cong. Rec. 6835, 6837 (1950) (section-by-section analysis) (amendment designed to supply "more practicable penalties, which can be gaged with reference to the seriousness of the offense"). Finally, the amended Act required agencies to report certain violations of the statute, and the actions taken, to the President and Congress. § 3679(i), 64 Stat. 768.

control in a broader sense. The House Report admonished the Executive Branch that "[a]ppropriation of a given amount *for a particular activity* constitutes only a *ceiling* upon the amount which should be expended *for that activity*." H.R. Rep. No. 81-1797, at 9 (emphasis added). Moreover, as noted above, Congress added specific language to the second clause of the section, dealing with obligations in advance of appropriations, which appears to presuppose that obligations are limited to the particular purposes Congress has authorized.

Between 1950 and 1982, Congress made only a few minor and technical amendments (not relevant here) to the Antideficiency Act. The Act achieved essentially its current form in 1982, as part of the general recodification of title 31 of the United States Code.[16] *See* H.R. Rep. No. 97-651, at 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 1895 (describing purpose of bill "to revise, codify, and enact without substantive change certain general and permanent laws related to money and finance as title 31, United States Code, 'Money and Finance'"). The new section 1341(a) differed in several ways from its predecessor. In describing unlawful expenditures and obligations, for example, the revisers changed the phrase "under any appropriation or fund in excess of the amount *available therein*" to "exceeding an amount *available* in an appropriation or fund *for the expenditure or obligation*." 31 U.S.C. § 1341(a) (emphasis added). In the second clause, the phrase "for the payment of money for any purpose, in advance of appropriations made for such purpose" became "for the payment of money before an appropriation is made." The House Report specified, however, that the bill made no substantive change in the law. *See* H.R. Rep. No. 97-651, at 1-3; 1982 U.S.C.C.A.N. at 1896. Accordingly, we understand these changes simply to have clarified the longstanding meaning of the Act. *See* H.R. Rep. No. 97-651, at 1 ("simple language has been substituted for awkward and obsolete terms").

Although the legislative history of the Antideficiency Act manifests particular congressional concern with the problem of overall deficiencies, we believe that history indicates that the Act's proponents sought not only to prohibit government agencies from spending funds in excess of their total annual appropriations (i.e., creating a deficiency), but also to enforce Congress's control over the uses to which public funds are put. This broader view of the Act's goals was expressed when the Act took its modern form in 1905 and 1906, and was reinforced when the 1950 amendments to the statutory language focused the Act's prohibition on expenditures in excess of any single appropriation or fund instead of expenditures within a fiscal year. Indeed, the legislative history from 1905 on indicates a

---

[16] In 1990, Congress added sections 1341(a)(1)(C) and (D) in conformity with the Balanced Budget and Emergency Deficit Control Act of 1985. Congress also clarified that the exception allowing the acceptance of voluntary or personal services in time of emergencies (*see* 31 U.S.C. § 1342 (1994)) may be applied only in the face of an imminent threat to life or property. *See* H.R. Rep. No. 101-964, at 1170 (1990) (Conf. Rep.), *reprinted in* 1990 U.S.C.C.A.N. 2374, 2875.

congressional intent to enforce the full extent of Congress's constitutionally mandated control over public spending. To be sure, in denouncing unauthorized spending, members typically focused only on examples that resulted in overall deficiencies, such as the excess spending on naval gun sights that depleted funds available for ship maintenance. But the comments of Representatives in 1905 and 1906 and the 1950 House Report are not so limited, and reflect a desire to prohibit *all* expenditures on particular projects in excess of authorized levels. *See, e.g.*, 39 Cong. Rec. at 3780 (Rep. Underwood criticizing use of "moneys appropriated for one purpose for a different purpose than Congress intended"); 40 Cong. Rec. at 1298 (Rep. Burton emphasizing Congress's right "to determine for what objects expenditures shall be made and how much shall be expended," and asserting that Congress must ensure that public funds "are applied to purposes which approve themselves to our judgment and to the judgment of the people"); H.R. Rep. No. 81-1797, at 9 ("Appropriation of a given amount *for a particular activity* constitutes . . . a *ceiling* upon the amount which should be expended *for that activity*.") (emphasis added).

The legislative history thus reinforces our conclusion that the Antideficiency Act prohibits not only expenditures or obligations in excess of overall appropriations, but also expenditures in excess of internal caps or conditions within particular appropriations acts. In our view, this reading of the Act better reflects its full history and evolution, and is more consistent with its purpose. As this Office has stated previously, "[t]he manifest purpose of the Antideficiency Act is to insure that Congress will determine for what purposes the government's money is to be spent and how much for each purpose." *Applicability of the Antideficiency Act Upon a Lapse in an Agency's Appropriation*, 4A Op. O.L.C. 16, 19-20 (1980). *See also Appropriation—Construction of New York Dry Dock*, 28 Op. Att'y Gen. 466, 466 (1910) (Secretary of the Navy may not borrow funds "from appropriations not strictly applicable" to meet the payments on a contract for the erection of a dry dock where funds specifically appropriated for that purpose have been exhausted).

### III. Judicial, Administrative, and Scholarly Interpretations of the Act

Our understanding of the Act's prohibitions is further supported by the purposes of the Constitution's Appropriations Clause, the decisions of the Supreme Court and the Comptroller General, and the views of scholars who have addressed the subject. The Antideficiency Act itself is unquestionably intended to enforce Congress's authority under the Appropriations Clause. As the Supreme Court has explained, that Clause is intended "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. at

428. The "letter of the difficult judgments reached by Congress as to the common good" is very often reflected in the conditions and internal caps included in appropriations laws. Accordingly, a construction of the Antideficiency Act that prohibits expenditures that do not necessarily result in overall deficiencies but that nevertheless frustrate difficult congressional judgments about the appropriate level of spending on a particular purpose ensures that Congress is able to exercise its full constitutional authority over public spending.

The Supreme Court has applied these principles on the rare occasions it has had to interpret any of the various versions of the Antideficiency Act. In *Hoe v. United States*, 218 U.S. 322 (1910), the Court held that, under the 1870 version of the Act and other similar enactments, the Civil Service Commission was legally incapable of incurring an obligation to pay more rent for a building it occupied than Congress had specifically appropriated for that purpose, and that any implied contractual obligation to pay fair market rental value in excess of the appropriated amount was a nullity. The relevant appropriations acts expressly stated that the sum of $4000 would be "in full compensation" for each year's use of the building. *Id*. at 332. The Court pointed out that "[i]t is for Congress, proceeding under the Constitution, to say what amount may be drawn from the Treasury in pursuance of an appropriation." *Id*. at 333. The agency could not contract for rent in excess of that amount, "particularly where . . . Congress had taken care to say . . . that the appropriation shall be in *full* compensation for the specific purpose named in the appropriation act." *Id*.; *see also Sutton v. United States*, 256 U.S. 575, 580-81 (1921) (under 1906 version of Act, Secretary of War could not obligate the government to pay more than the $23,000 appropriated for improving a channel); *Bradley v. United States*, 98 U.S. 104 (1878) (where Congress appropriated only $1800 for payment of third year's rent under a contract for annual rent of $4200, lessor could not recover anything beyond that amount). Because none of these cases involved situations in which officers or agencies drew upon other appropriated funds and made expenditures in excess of the amount (or limits) Congress had specified for the purpose in question, the Court did not squarely address whether such expenditures violate the Act. In addition, the Court was applying versions of the Act that did not use the term "available." Nevertheless, in each case the Court treated the limitation in the relevant appropriation as an internal cap, and cited the Act for the proposition that federal officials were legally incapable of obligating the government to exceed that cap. These holdings thus appear to support our conclusion that, when Congress uses an internal cap or condition to limit the amount of money that can be used for a particular purpose, only the amount of money specified in the cap or condition is "available," within the meaning of the Antideficiency Act, for that purpose, and any expenditure in excess of that amount is an "expenditure or obligation exceeding an amount available in an appropriation."

More recently, the Federal Circuit has held that "[s]ection 1341(a)(1)(A) makes it clear that an agency may not spend more money for a program than has been appropriated *for that program*." *Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States*, 48 F.3d 1166, 1171 (Fed. Cir.) (emphasis added), *cert. denied*, 516 U.S. 820 (1995). On this basis, the court rejected the argument that, while Congress had failed to appropriate sufficient earmarked money to fund certain entitlements under the Impact Aid Act, Pub. L. No. 81-874, 64 Stat. 1100 (1950), the Department of Education should have redirected funds from other programs in order to cover the shortfall, and concluded that, if the Department had transferred money from other appropriations, "it would have been spending more money than Congress had appropriated for [those] entitlements, in violation of § 1341(a)(1)(A)." *Id*. Similarly, in *Eastern Band of Cherokee Indians v. United States*, 16 Cl. Ct. 75 (1988), the Court of Claims held that if Congress has not appropriated funds for a particular purpose, it would violate the Antideficiency Act for officials to expend other funds for that purpose. The court denied the claim of the Eastern Band of Cherokee Indians that the Department of the Interior should have given them increased funds for their school under a statutory provision that provides for equivalent funding for schools operated by the Bureau of Indian Affairs, as compared with public schools. *Id*. at 76. At the time of the tribe's request, no appropriations had been made for the Set-Aside Fund from which the payments were required to be made by the Department's implementing regulations. *Id*. Although the tribe argued that the Department could have made payments from other accounts, the court held that such an action would violate the Antideficiency Act. *Id*. at 79. These cases are consistent with this Office's conclusion that "there is no presumption that Congress has made funds available for every authorized purpose in any given fiscal year." *Anti-Lobbying Restrictions Applicable to Community Services Administration Grantees*, 5 Op. O.L.C. 180, 184 (1981).[17]

One district court, however, has found that the expenditure of funds in violation of a prohibition within an appropriation does not violate the Antideficiency Act. The case, *Southern Packaging & Storage Co. v. United States*, 588 F. Supp. 532 (D.S.C. 1984), involved a "buy American" restriction in the Department of Defense's appropriations.[18] The court held that, although the Department's acquisition of food items produced in Canada from ingredients obtained from within the United States violated this restriction, it did not violate the

---

[17] As noted above, we take no position on whether earmarks of the type involved in these cases operate as internal caps, or whether the Department's transfer or reprogramming authority would, in some contexts, be available to permit spending in excess of an earmark.

[18] The appropriation stated: "No part of any appropriation contained in *this* Act . . . shall be available for the procurement of any article of food . . . not grown, reprocessed, reused, or produced in the United States or its possessions . . . ." Pub. L. No. 97-114, § 723, 95 Stat. 1565, 1582 (1981) (emphasis added). It thus did not bar the use of *any* funds for that purpose.

Antideficiency Act because there was "no evidence [that the Department] authorized expenditures beyond the amount appropriated by Congress for the procurement of" the ready-to-eat meals. *Id*. at 550. The court did not explain this holding or suggest that there was another appropriation from which the Department could obtain funding for the meals. We disagree with the court's apparent conclusion that, even though the appropriation forbade the purchase of non-American food items, there remained funds "available" in *that* appropriation for such purchases within the meaning of the Antideficiency Act. The district court's unexplained decision is inconsistent with the Antideficiency Act's legislative history and evolution and with the rest of the (limited) caselaw.[19]

Our interpretation of the Act is also consistent with that of the Comptroller General, including Comptroller General decisions applying the pre-1982 version of the Act. *See, e.g*., 60 Comp. Gen. 440 (1981) (incurring an obligation to pay overtime to employees in excess of a ceiling in an agency's appropriation violates the Antideficiency Act where no other funds are available for that purpose); 42 Comp. Gen. 272, 275 (1962) (Antideficiency Act reflects congressional intent to keep departments within limits and purposes of appropriations annually provided) (quoted with approval in *Authority to Use Funds from Fiscal Year 1990 Appropriations to Cover Shortfall from Prior Year's Pell Grant Program*, 14 Op. O.L.C. 68, 77 (1990)); *see generally* 2 *Federal Appropriations Law* at 6-43 to 6-45 (2d ed. 1992).[20] The Department of Defense has also adopted this interpretation of the Act. *See* Dep't of Defense, Dir. 7200.1, Administrative Control of Appropriations (May 4, 1995) (Antideficiency Act violation occurs when disbursements are made that exceed statutory or regulatory limitations on amounts of an appropriation that may be used for a particular purpose); Dep't of Defense, Accounting Manual, DoD 7220.9-M at 21-6 (Feb. 1988) (expenditure in excess of a statutory limitation

---

[19] The General Accounting Office ("GAO"), moreover, has expressly criticized the *Southern Packaging* decision. *See* 2 *Federal Appropriations Law* at 6-45 to 6-46 (2d ed. 1992) (discussing the *Southern Packaging* decision and suggesting that, while not every unauthorized expenditure—*e.g*., an unauthorized long-distance telephone call—should be held to violate the Antideficiency Act, where Congress has expressly prohibited the use of appropriated funds for a particular expenditure, "it seems clear" that there are no funds "available" for that item). This Opinion does not address, or foreclose future consideration of, the possibility that the Act may incorporate a de minimis exception for inadvertent or negligible violations, such as that suggested by GAO in its discussion of the *Southern Packaging* decision, or recognized by the Comptroller General and this Office with respect to the Purpose Statute, 31 U.S.C. § 1301(a). *Cf*. 64 Comp. Gen. 370, 380-81 (1985) (permitting nonreimbursable interagency details that have a negligible impact on the loaning agency's appropriations); Memorandum for Margaret C. Love, Associate Deputy Attorney General, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Deputation of Interior Department Inspector General Personnel* (Apr. 11, 1990) (concluding that nonreimbursable detail involving 280 man-hours would satisfy de minimis exception to Purpose Statute).

[20] As we explained above, the opinions and legal interpretation of the Comptroller General and the GAO are not binding upon departments, agencies, or officers of the Executive Branch.

that legally limits the availability of funds constitutes a violation of the Antideficiency Act).

Finally, our conclusion that a violation of a condition or an internal cap in an appropriation violates the Antideficiency Act is supported by the views of a number of legal scholars. As one commentator has explained, "the plain terms of the Act broadly codify the [constitutional] Principle of Appropriations Control," a principle "that is broader than the particular concern that led to its enactment." *See* Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. at 1374-75; *id.* at 1375 & n.157 (arguing that the Act permits the Executive to spend funds only for the objects authorized by Congress, and noting Comptroller General's view that "the Anti-Deficiency Act prohibits expenditure in some cases where 'coercive deficiencies' are not threatened"); *see also* Ralph S. Abascal & John R. Kramer, *Presidential Impoundment Part I: Historical Genesis and Constitutional Framework*, 62 Geo. L.J. 1549, 1587 (1974) ("The House Appropriations Committee proposed [the Antideficiency Act] to end abuses that had continued for many years—the use of monies appropriated for one purpose for a different purpose and the use of coercive deficiencies to obtain mid-year increases in financing."). J. Gregory Sidak, for example, has suggested that "[i]f Congress expressly prohibits the spending of any funds to examine a particular policy, then even the expenditure of a dollar by the President to recommend the prohibited policy to Congress would 'exceed[] an amount available in an appropriation' and thus violate the Antideficiency Act." J. Gregory Sidak, *The Recommendation Clause*, 77 Geo. L.J. at 2101 (arguing, however, that application of the Act to appropriations riders of this type would violate the Recommendation Clause). William C. Banks and Peter Raven-Hansen have argued that violation of an appropriation rider such as the Boland Amendment, which prohibited the expenditure for certain purposes of any funds available to the Central Intelligence Agency and the Department of Defense, also violates the Antideficiency Act.[21] *National Security Law and the Power of the Purse* 139 (1994); *see also* Kathryn R. Sommerkamp, *Commanders' Coins: Worth Their Weight in Gold?*, Army Law. 6, 13 & n.70 (Nov. 1997) (exceeding a limitation in an appropriation violates the Antideficiency Act); Paul D. Hancq, *Violations of the Antideficiency Act: Is the Army Too Quick to Find Them?*, Army Law. 30, 34 (July 1995) (Antideficiency Act violated when an agency exceeds an "absolute ceiling" in an appropriation because there are no proper funds "available" for the excess).

---

[21] *See also* S. Rep. No. 100-216, at 411-12 (1987) (Iran-Contra Investigation Report) (implying that use of private and foreign funds to circumvent Boland Amendment violated Antideficiency Act); Olson Memorandum.

## IV. Conclusion

In sum, given the underlying purpose of the Antideficiency Act—control by Congress of both the amount and objects of Executive Branch spending—we conclude that when Congress has explicitly prohibited an agency's use of any funds for a particular purpose by placing a condition in an appropriations act, no funds are legally "available" for that purpose within the meaning of the Act. Similarly, when Congress has expressly limited an agency's use of any funds in excess of a particular amount for a certain purpose by means of an internal cap, there remain no legally "available" funds for that purpose once the statutory limit has been reached. Therefore, subject to the various reservations noted above, we conclude that any expenditure of funds in violation of a condition or internal cap in an appropriations act would violate the Antideficiency Act.[22]

> RANDOLPH D. MOSS
> *Assistant Attorney General*
> *Office of Legal Counsel*

---

[22] Although all violations of sections 1341(a) and 1342 of title 31 must be reported to Congress, *see* 31 U.S.C. § 1351 (1994), we offer no view as to the applicability of the criminal and civil penalties imposed by the Act. In contemplating the availability of any sanction, very difficult considerations, such as fair warning and desuetude, would have to be evaluated. *See generally United States v. Lanier*, 520 U.S. 259, 267 (1997) (in construing a criminal statute "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal"). We note that, to our knowledge, no criminal or civil penalties have been sought under the Act in the almost 95 years that such penalties have been available. Indeed, one member of Congress stated in 1906 that there were "not likely to be any" prosecutions under the Act, suggesting that Congress should instead withhold deficiency appropriations where the Act had been violated. *See* 40 Cong. Rec. at 1276 (1906) (Rep. Brundidge). *See also Applicability of the Antideficiency Act Upon a Lapse in an Agency's Appropriation*, 4A Op. O.L.C. at 20 ("This Department will not undertake investigations and prosecutions of officials who, in the past, may have kept their agencies open in advance of appropriations. Because of the uncertainty among budget and accounting officers as to the proper interpretation of the Act and Congress's subsequent ratifications of past obligations incurred during periods of lapsed appropriations, criminal sanctions would be inappropriate for those actions.")